*NOT FOR PUBLICATION*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ABIGAIL L.,<br><br>    Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI,<br>Acting Commissioner of Social<br>Security,<br><br>    Defendant. | Civil Action No. 21-2275 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

Abigail L. ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security, Kilolo Kijakazi ("Defendant"), denying Plaintiff disability benefits under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record, the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence and, accordingly, the ALJ's decision is **AFFIRMED**.

### I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born on January 30, 1988, and was 26 years old[1] at the alleged disability onset date of December 1, 2014. (Administrative Record ("A.R.") 99.) Plaintiff completed college prior to her alleged disability and worked as a nursery and pre-school teacher. (A.R. 316, 89, 245, 317.) Plaintiff alleges the following impairments: seizures, bipolar disorder, and chondromalacia. (A.R.

---

[1]    Plaintiff is considered to be a "younger person" because she was under the age of 50 years old when she applied for disability benefits. *See* 20 CFR 404.1563(c).

15, 238-39, 315.)  Plaintiff filed an application for disability benefits in December 2017.  (A.R. 15.)  Plaintiff's application was denied initially on April 19, 2018, and upon reconsideration on May 5, 2018.  (A.R. 136, 142.)  Following these denials, Plaintiff filed a request for a disability benefits hearing.  On February 10, 2020, Plaintiff testified before Administrative Law Judge Leonard Costa ("ALJ").  (*Id*.)  Following this hearing, the ALJ issued his decision, finding Plaintiff not disabled under the Act.  (A.R. 12-31.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision in December 2020.  (A.R. 1-6.)  Thereafter, Plaintiff filed the instant appeal.  (ECF No. 1.)

### A.   Review of the Medical Evidence

#### i.   Physical Impairments

In December 2014, Plaintiff visited her primary care provider at Montgomery Medical Associates ("MMA"), complaining of mild deep vein thrombosis, but denied "associated signs and symptoms."  (A.R. 510.)  On examination, Dr. Joseph J. Pecora, D.O., observed that Plaintiff appeared healthy and well developed, and her exam was unremarkable.  (A.R. 510-11.)  However, the following week Plaintiff had a seizure at the doctor's office and informed the nurse that she had had six seizures that day.  (A.R. 506.)  Dr. Pecora assessed Plaintiff with Chronic Venous Embolism and Thrombosis, Deep Vessels Proximal Low and Epilepsy Nonconvulsive without Intractable.  (A.R. 507.)  Plaintiff indicated that she sought short term disability for six months due to multiple pseudo-seizures, and Dr. Pecora signed her disability forms.  (*Id*.)  That same month, Plaintiff went to Northeast Regional Epilepsy Group ("NREG"), at Saint Peter's University Hospital, to further determine whether she was experiencing seizures or nonepileptic events.  (A.R. 477.)  On neurological examination, Dr. Enrique Feoli, M.D., found Plaintiff to be awake and alert, oriented to time, place, and person with normal recent and remote memory, attention span, and

concentration.  (A.R. 478.)  Plaintiff underwent video EEG monitoring that was "normal," but multiple events were captured that likely constituted psychogenic non epileptic episodes.  (A.R. 502-03.)  On December 19, 2014, Plaintiff was admitted to the Emergency Room with the chief complaint that she had a pseudo seizure and hit her head on the ground.  (A.R. 752.)  A CT scan of her head showed no evidence of intracranial bleeding.  (A.R. 754.)  Dr. Brenda Wu, M.D., Ph.D., diagnosed Plaintiff with psychogenic non-epileptic seizures ("PNES")[2], frontal lobe syndrome, and migraines, and advised not to drive for six months following her most recent seizure episode.  (A.R. 497.)

In January 2015, Plaintiff returned to NREG for a follow-up appointment.  (A.R. 490.)  Her neurological examination was unremarkable, but her review of systems was remarkable for chronic headache, recurrent episodic convulsion with unresponsiveness, pulmonary embolism, anxiety and depression, sleep disturbance, and overweight.  (*Id.*)  Dr. Wu noted that Plaintiff's PNES with frontal lobe syndrome improved with Topiramate, but warned that Plaintiff was at high risk of developing epileptic seizures.  (*Id.*)

In March 2015, Plaintiff sought a disability exam at MMA based on intermittent seizures. On examination, Dr. Pecora indicated that Plaintiff appeared healthy, alert, and oriented with full strength in her extremities and normal muscle tone.  (A.R. 465-66.)  That same month, at an NREG follow-up, Plaintiff reported "much fewer episodes" of non-epileptic seizure events (spells on a total of eight days in the month prior) and stated that she "tolerated her [medication] regimen well."  (A.R. 460.)  On examination, Plaintiff was awake, alert and well-oriented with fluent and

_____

[2]     "PNES" are "episodes of movement, sensation, or behaviors that are similar to epileptic seizures but do not have a neurologic origin; rather they are somatic manifestations of psychologic distress."  Taoufik M. Alsaadi, M.D., and Anna Vintner Marquez, M.D., American Acad. Fam. Physicians,                Psychogenic                Nonepileptic                Seizures, https://www.aafp.org/pubs/afp/issues/2005/0901/p849.html# (last visited October 19, 2022).

appropriate speech, 5/5 motor strength in her extremities, symmetrical muscle stretch reflexes, intact sensation and no dysmetria. (*Id*.) Dr. Wu recommended that Plaintiff increase her vitamin D intake and continue psychotherapy. (A.R. 461.)

At a primary care follow-up visit in April 2015, Plaintiff stated that she was having three seizures on a weekly basis. (A.R. 458.) Apart from purpura on her legs, however, Dr. Pecora's findings on examination were the same. (A.R. 459.) Dr. Pecora noted that Plaintiff could not drive, but was able to work part time. (*Id*.)

In May 2015, a nurse at Plaintiff's primary care provider reported that Plaintiff had a seizure at the office which lasted fewer than five minutes. (A.R. 454.) According to Plaintiff's mother, Plaintiff had already had five seizures earlier in the day and was in a part-time in patient care facility because she tried to hurt herself. (*Id*.) Plaintiff's examination remained unchanged from April 2015. In June 2015, Plaintiff went to the Emergency Room for an allergic reaction and was prescribed Benadryl. (A.R. 447.) An imaging study showed no evidence of right or left femoro-popliteal thrombosis. (A.R. 449.)

The following month, in July 2015, Plaintiff went to Princeton Medical Group where she presented for pulmonary embolism. (A.R. 440.) Plaintiff's physical exam and psychiatric exams were unremarkable. (*Id*.) She was in no acute distress, and she was oriented to time, person, place, and situation. (*Id*.) A visual overview of all four of her extremities was also normal. (*Id*.) Dr. Thomas Blom, M.D., assessed Plaintiff with other and unspecified coagulation defects and recommended a hypercoagulability workup. (*Id*.) The workup was negative for abnormality. (A.R. 662.)

Plaintiff went to the Emergency Room at Robert Wood Johnson University Hospital ("RWJUH") in New Brunswick on three occasions from June 2015 through August 2015, with the

primary complaint of seizures and associated injuries from falling.  (A.R. 1967-82.)  In August 2015, Plaintiff also went to Saint Peter's University Hospital where she was diagnosed with "seizure secondary to medication noncompliance" after she stopped taking her medication upon knowing that she was pregnant.  (A.R. 699-700.)  Dr. Roger Behar, M.D., changed her medication due to her pregnancy.  (A.R. 730.)  Plaintiff's physical and neurological examinations were unremarkable; Plaintiff was well developed, well nourished, and in no acute distress and appeared to be alert and oriented fully to person, place and time.  (A.R. 729.)  She spoke fluently and named, repeated, and followed complex commands.  (*Id.*)

However, on October 1, 2015, Plaintiff returned to the Emergency Room.  (A.R. 685.) There, she reported that a coworker witnessed her have a seizure and lose consciousness.  (*Id.*) Plaintiff's neurological examination was normal; she was oriented to person, time, and place, and displayed no motor or sensory deficits.  (A.R. 674.)  Her recent memory, cranial nerves, and hearing were intact.  (*Id.*)  She also exhibited normal, symmetric muscle strength and tone as well as normal gait and body control.  (*Id.*)  The emergency physician recommended a video EEG and adjusted Plaintiff's medicine dosages.

Plaintiff also went to Princeton & Rutgers Neurology on four occasions between August and December 2015.  (A.R. 431-33, 843, 854.)  She noted that she was pregnant, had been seen in the Emergency Room for seizure episodes, had worsening headaches, and was taking, among other medications, Topamax, which seemed to somewhat control her seizures.  (A.R. 431.)  Her exams were largely unremarkable, and Dr. Seema Dixit, D.O., indicated that it was not clear if her recent episodes were truly seizures or nonepileptic.  (A.R. 432, 844, 847, 848, 850, 855.)  At a December visit, Dr. Dixit stated that she discussed disability with Plaintiff and opined that she may be a candidate based on the episodes and her history of bipolar disorder.  (A.R. 845.)

In December 2015, Plaintiff also went back to Saint Peter's University Hospital.  There, she complained that while she had been having seizures on average about every three weeks, they had increased in frequency and length.  (A.R. 662.)  Plaintiff was 20 months pregnant at the time, and reported that her seizures usually affect her left arm and shoulders, and leave her in a postictal confusion state for approximately ten minutes.  (A.R. 662.)  On examination, Dr. Douglas Frenia, M.D., observed that Plaintiff was in no acute distress, and noted no seizure activity or postictal state event.  (A.R. 663.)  Plaintiff reported some pain on her anterior thighs, which she associated with her pregnancy.  (*Id*.)  Dr. Frenia increased Plaintiff's dose of Keppra and directed Plaintiff to the ICU for neuro checks.

Following the date last insured, December 31, 2015, Plaintiff continued to seek treatment for her episodes.  She was admitted to Overlook Medical Center and monitored through video-EEG from September 27, 2016 through October 1, 2016.  (A.R. 976.)  Her EEG was normal.  (*Id*.)  Episodes of eye fluttering, hand trembling and unresponsiveness were captured and consistent with psychogenic non-epileptic spells.  (*Id*.)  In November 2016, at an appointment at NREG, Dr. Ching Tsao, M.D., stressed that multiple studies failed to reveal evidence in support of an epilepsy diagnosis and stated that Plaintiff's first priority should be to initiate treatment for PNES with a neuropsychologist.  (A.R. 978.)  In March 2018, a separate provider at NREG also assessed Plaintiff with nonepileptic events and emphasized that antiseizure medicine was not indicated. (A.R. 1829.)

ii.   *Mental Impairments*

Plaintiff also alleges disability due to bipolar disorder type II.  (A.R. 315.)  In April 2015, Plaintiff attempted to commit suicide by overdose.  (A.R. 778.)  The following month, on May 7, 2015, Plaintiff underwent a neuropsychological evaluation at Genpsych PC.  (A.R. 777.)  On

examination, Plaintiff appeared angry, listless, irritable, and tense, but was attentive and communicative.  (A.R. 781.)  Dr. Olga M. Tchikindas, M.D., described Plaintiff's demeanor as "glum" and "sad," and revealing depressed mood and thought content.  (*Id.*)  Plaintiff denied suicidal and homicidal ideation, and Dr. Tchikindas found her associations intact, thinking logical, and thought content appropriate.  (*Id.*)  Plaintiff's cognitive functioning and fund of knowledge were also intact and age appropriate.  (*Id.*)  Dr. Tchikindas recommended that Plaintiff be admitted to an adult day behavioral therapy partial hospitalization program, and prescribed Lithium for mood stabilization, in addition to her then-current medications.  (*Id.*)

Plaintiff returned to Genpsych for ongoing care from May 2015 through October 2015.  (A.R. 783-840.)  On examination, Plaintiff's affect and mood varied, but she was frequently described as friendly, cooperative, attentive, communicative, and casually groomed.  (A.R. 783-839.)  Plaintiff's short- and long-term memory and judgment often appeared intact, and her vocabulary and fund of knowledge indicated cognitive functioning in the normal range.  (*Id.*)  Plaintiff consistently denied suicidal or self-injurious ideas at her therapy sessions.  (*Id.*)  In August 2015, Plaintiff reported that she discontinued her medications when she learned of her pregnancy.  (A.R. 807.)  However, at a subsequent session, she stated that a high-risk pregnancy specialist recommended that she resume Prozac.  (A.R. 812.)  At an OB/GYN appointment on December 31, 2015, Plaintiff reported her mood as "stable," and stated that she was continuing with therapy and excited about her pregnancy.  (A.R. 866.)  Plaintiff's son was born in March 2016.  (A.R. 57.)

### iii.    *State Agency Opinions*

On January 27, 2016, state-agency psychologist, Sharon Ames-Dennard, Ph.D., reviewed the record and found Plaintiff had mild limitations in maintaining social functioning and concentration, persistence, or pace, and no restriction of activities of daily living or repeated

episodes of decompensation of extended duration.  (A.R. 104.)  Dr. Ames-Dennard stated that Plaintiff's "statements [are] credible" and that Plaintiff "has a mental impairment that could reasonably produce the alleged symptoms," but concluded that there was "no evidence of a mental impairment that meets or equals a listing."   (A.R. 105.)  On May 23, 2018, Leif Davis Psy.D., reviewed the record and found insufficient evidence to substantiate the presence of bipolar, depressive, and related disorders, or anxiety and obsessive-compulsive disorders.  (A.R. 125.)  On review on April 12, 2018, state agency psychologist, Helen Feldman, Ph.D., agreed.  (A.R. 115.)

State-agency physicians, Arthur Pirone, M.D., Deogracias Bustos, M.D., and Joseph Udomsaph, M.D., reviewed the record on separate occasions in February 2016, April 2018, and May 2018, respectively.   On February 2, 2016, Dr. Pirone noted that Plaintiff had a seizure disorder, but concluded that the impairment was not severe at the time because Plaintiff "ha[d] been off anti-convulsant medication since becoming pregnant and ha[d] not had a recurrent seizure." (A.R. 103.)  On April 10, 2018, Dr. Bustos opined that there was insufficient evidence prior to December 31, 2015, to support a finding of a severe physical impairment.  (A.R. 114.)  Thereafter, on May 21, 2018, Dr. Udomsaph affirmed Dr. Bustos' prior decision.

iv.   *Plaintiff's Function Report and Questionnaire*

Plaintiff completed a function report on January 15, 2016.  In her report, Plaintiff stated that she takes medicine, prepares simple meals, handles chores, including light cleaning and laundry, shops in stores and online, and pays bills.  (A.R. 306-09.)  Plaintiff also stated that except for assistance in the bathroom while bathing in the event of an episode, Plaintiff has no issues with personal care.  (A.R. 307.)  With respect to Plaintiff's ability to get around, she stated that while she goes outside most days, she cannot drive or go out alone due to her seizures.  (A.R. 286.)  As for social activities, Plaintiff noted that she goes out to eat and to the movies, as well as to

Synagogue on a regular basis.  (A.R. 287.)  Regarding mental limitations, Plaintiff stated that she is able to focus long enough to complete the tasks she needs to accomplish and can follow written instructions very well, but needs to write down spoken instructions if they involve more than a couple of items.  (A.R. 311.)

On January 15, 2016, Plaintiff completed a questionnaire detailing the historical frequency and duration of her alleged seizure activity.  (A.R. 294.)  Plaintiff indicated that her seizures lasted from one to five minutes on average and that she had had 20 episodes in the month of July 2015; 14 in the month of August 2015; seven in the month of September 2015, eight in the month of October 2015; 12 in the month of November 2015 and one in the Month of December 2015.  (*Id*.)

### B.     Review of Testimonial Record

#### i.     *Plaintiff's Testimony*

At the February 2020 hearing before the ALJ, Plaintiff testified that she had a bachelor's degree in history and has been unable to work since December 7, 2014.  (A.R. 48.)  Plaintiff stated that she previously worked as an assistant teacher and lead teacher for children ages two to five.  (A.R. 50-52.)  According to Plaintiff, she stopped working due to seizures that started in June 2014 and increased in frequency.  (A.R. 56.)  As of the beginning of 2015, Plaintiff testified that she experienced four to five episodes daily and was prescribed Topamax.  (*Id*.)  Plaintiff explained that the seizures caused her to hit her head on things and pull muscles.  (A.R. 59.)  In July 2015, however, Plaintiff testified that she discovered that she was pregnant, and her physicians ceased her Topamax prescription and started her on Keppra, which is safe for pregnant women.  (A.R. 57.)  During that time, Plaintiff testified that she experienced seizures every couple of weeks to a month.  (*Id*.)  Following her pregnancy, Plaintiff stated that her physician lowered her dose of Keppra, and as of the date of her testimony, she had been getting seizures one to four times

monthly.  (*Id*.)  Plaintiff also testified that she had migraines three to four times a week in 2014.  (A.R. 62.)  In addition, Plaintiff stated that she had cyclical vomiting syndrome in 2014-2015, for which she was hospitalized about twice a year.  (A.R. 63-64.)  Regarding Plaintiff's ability to walk, Plaintiff testified that she frequently uses a cane due to an injury to her right leg from 2009.  (A.R. 66-67.)  Further, Plaintiff stated that she went to Princeton Orthopedics for related issues with her knees in 2014-2015.  (A.R. 68-69.)

Regarding her mental health issues, Plaintiff stated that while she has had generalized anxiety her whole life, she experienced debilitating panic attacks at least once or twice a week back in 2014-2015.  (A.R. 60.)  Plaintiff also testified that she was diagnosed with bipolar back in 2014 but was having symptoms of undiagnosed dissociative identity disorder ("DID") at the time.  (A.R. 70.)  Although she was not formally diagnosed with DID until 2017, Plaintiff stated that she "lost time" at times and her memory of specific events, including multiple suicide attempts.  (A.R. 70-71.)

### ii.    *Plaintiff's Husband's Testimony*

Plaintiff's husband, Alexander Welsher, testified that he began dating Plaintiff on a regular basis in 2015.  (A.R. 78.)  He stated that he first observed her having a seizure in a synagogue in September 2014.  (*Id*.)  Thereafter, Mr. Welsher testified that at its worst, he saw Plaintiff have seizures two to three days a week where each day included as many as five or six seizures.  (A.R. 81.)  As for Plaintiff's mental impairments, Mr. Welsher testified that he observed three to four dissociative episodes in which Plaintiff exhibited signs of stronger depression, anxiety, confusion, fear, and lack of awareness as to her location.  (A.R. 84-85.)

### iii.   *Vocational Expert's Testimony*

Vocational Expert, Kenneth Smith (the "VE") began his testimony by classifying Plaintiff's past employment teaching according to the Dictionary of Occupational Titles ("DOT"). (A.R. 88.)  The VE classified Plaintiff's assistant teacher job as "nursery attendant," DOT # 359.677-018, a semi-skilled position with a SVP level of 4, and Plaintiff's lead teacher position as "preschool teacher," 092.227-018, a skilled job with a SVP level of 7.  (A.R. 89.)  Both positions are considered "light" by the DOT.  (*Id*.)  Turning to hypotheticals, the ALJ asked the VE whether a younger individual with a college education and the same past work experience as Plaintiff could perform his or her past work if the VE assumes light exertional level with the following limitations: "no exposure to unprotected heights or hazardous machinery, . . . occasional interaction with the general public, co-workers, and supervisors, would be able to understand, remember, and carry out simple instructions with only occasional changes to essential job functions, and would be able to make simple work-related decisions."  (A.R. 89-90.)  The VE testified that the hypothetical younger individual would not be able to perform the same past work experience as Plaintiff given the ALJ's additional restrictions.  (A.R. 90.)  Nonetheless, the VE also testified that an individual could perform the following positions under the ALJ's limitations: Cleaner Housekeeping, DOT # 323.687-014, Price Marker, DOT # 209.587-034, and Routing Clerk, DOT #222.687-022.  (A.R. 90.)  As a follow-up to the first hypothetical, the ALJ asked the VE to assume the same restrictions, but to add no direct contact with the general public and inability to work in tandem with co-workers, such as on an assembly line.  (A.R. 91.)  The VE responded that the three cited positions would still exist.  (*Id*.)

Under the next hypothetical, the ALJ asked whether, assuming a sedentary occupational base, and limitations, including no exposure to unprotected heights and hazardous machinery; only occasional interaction with the general public, co-workers, or supervisors; the ability to

understand, remember, and carry out simple instructions with only occasional changes to essential job functions and make simple work-related decisions; and the use of a cane to ambulate more than 100 feet or uneven terrain, if there would be any representative jobs that a hypothetical individual could perform.  (*Id*.)  The VE testified that such an individual could perform the jobs of Personal Document Preparer, DOT # 249.587-018, Addressing Clerk, DOT # 209.587-010, and Inspector as a Touch-up Screener, #726.684-110.  (*Id*.)  All three jobs are unskilled, SVP level two, and sedentary.  (A.R. 92.)  The VE also clarified that these positions would still exist if the ALJ were to indicate that the individual could have no direct contact with the general public and would be unable to work in tandem with co-workers.  (*Id*.)  Finally, the ALJ asked the VE whether any of the representative light or sedentary jobs would still exist if the VE were to further assume that the individual would be off-task 15 percent of the workday, and/or absent from work three or more times per month due to impairment related limitations.  (*Id*.)  The VE opined that under the off-task hypothetical, there were no other positions within the national economy that such an individual could perform.  (*Id*.)

### C.    The ALJ's Findings

On May 26, 2020, the ALJ issued a written decision examining whether Plaintiff satisfied her burden of demonstrating disability under the standard five-step sequential evaluation process. (A.R. 15-25.)  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of December 7, 2014, through her date last insured of December 31, 2015.  At step two, the ALJ found Plaintiff's obesity, bipolar disorder,

anxiety, psychogenic seizure disorder, migraine headaches, post-traumatic stress disorder ("PTSD"), and status post right ankle fracture in 2009 to be severe impairments. (A.R. 18.)

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id*.) Specifically, the ALJ considered listings 1.02, major dysfunction of a joint(s); 1.06, fracture of the femur, tibia, pelvis, or one or more of the tarsal bones; and mental health impairment listings, 12.04, 12.06, 12.07, and 12.15. With respect to Plaintiff's obesity and migraine headaches, the ALJ noted that although these impairments cannot meet a listing, as they are not listed impairments, the ALJ considered analogous and related listings. (*Id*.) As to Listing 1.02, the ALJ found that Plaintiff's conditions did not meet major dysfunction of a joint(s), because the evidence did not establish that Plaintiff has the degree of difficulty in performing fine and gross movements as defined in 1.00(B)(2)(c), or the degree of difficulty in ambulating as defined in 1.00(B)(2)(b). Similarly, as to Listing 1.06, the ALJ concluded that the record did not establish that solid union was not evident or that Plaintiff had an inability to ambulate effectively. (*Id*.)

Turning to Plaintiff's mental health conditions, the ALJ determined that Plaintiff's impairments, considered singly and in combination, did not meet the criteria of listings 12.04, 12.06, 12.07, and 12.15 because the "paragraph B" and "paragraph C" criteria were not met. (*Id*.) "Paragraph B" criteria are satisfied when the mental impairments result in at least one extreme or two marked limitations in the following broad areas of functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. Here, the ALJ determined that Plaintiff had "moderate" limitations in all areas of functioning. (A.R. 19.) Because the ALJ did not find at least two marked limitations or one extreme limitation, the ALJ concluded that the "paragraph B" criteria were not

met.  (A.R. 19.)  In addition, the ALJ found that the evidence failed to establish the "paragraph C" criteria as the record does not show that Plaintiff has only marginal adjustment, *i.e.*, minimal capacity to adapt to changes in Plaintiff's environment or to demands that are not already part of Plaintiff's daily life.  (*Id*.)

At step four, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform light work except:

> [T]here should be no exposure to unprotected heights or hazardous machinery.  There should be no direct contact with the general public.  The claimant cannot work in tandem with coworkers, such as on an assembly line.  She can only perform work where production is measured at the end of the day and not throughout the course of the day.  The claimant is able to understand, remember, and carry out simple instructions with only occasional changes to essential job functions.  She is able to make simple work related decisions.

(A.R. 20.)  In making this determination, the ALJ explained that a light exertional capacity limitation was appropriate considering record evidence demonstrating a normal gait, normal (5/5) motor strength and normal muscle tone and bulk.  (A.R. 22.)  However, the ALJ limited Plaintiff to no exposure to unprotected heights or hazardous machinery given Plaintiff's seizure disorder. (A.R. 23.)  In addition, the ALJ endorsed a limitation to simple instructions and simple work-related decisions, citing record evidence of Plaintiff's normal/intact memory, fund of knowledge within normal limits, and intellectual functioning in the superior range on examination.  (*Id*.) Moreover, the ALJ determined that while Plaintiff should have no direct contact with the public, she can tolerate occasional interaction with co-workers and supervisors based on record evidence describing Plaintiff as cooperative and pleasant.  (*Id*.)

At step five, ALJ determined that given Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can

perform.  (A.R. 25.)  Specifically, the ALJ found that the occupations of Housekeeper, Price Marker, and Routing Clerk exist in "significant numbers" in the national economy.  (*Id.*)  In sum, the ALJ concluded that Plaintiff had not been under a disability as defined in the Social Security Act, from December 7, 2014 through December 31, 2015, the date of last insured.  (*Id.*)

## II.    STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record."  42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential.  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).  "It means such relevant evidence as a reasonable mind might accept as adequate."  *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924, 113 S. Ct. 1294, 122 L. Ed. 2d 685 (1993).  Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's

decision will be upheld if it is supported by the evidence.  *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements.  *See* 42 U.S.C. § 423(c).  Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...."  42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427.  An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled.  *See* 20 C.F.R. § 404.1520.  First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity."  *Id*. at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).  If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits.  *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5.  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching,

carrying or handling." *Id*.  A claimant who does not have a severe impairment is not considered disabled.  *Id*. at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List").  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits.  *See id*. at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5.  If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent.  *See* 20 C.F.R. § 404.1526(a).  If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment.  *Id*.  An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar.  *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work.  20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141.  If the claimant can perform past relevant work, the claimant is determined to not be disabled.  20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42.  The claimant bears the burden of demonstrating an inability to return to the past relevant work.  *Plummer*, 186 F.3d at 428.  Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy."  *Bowen*, 482 U.S. at 146-47

n.5; *Plummer*, 186 F.3d at 428.  This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience.  20 C.F.R. § 404.1520(f).  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled.  *Id.*

III.   **PLAINTIFF'S CLAIMS ON APPEAL**

Plaintiff advances three arguments on appeal.  First, Plaintiff contends that the ALJ improperly evaluated Plaintiff's obesity.  (*See* Plaintiff's Brief ("Pl. Br.") at 5-14.)  Second, Plaintiff argues that the RFC was not based on substantial evidence.  (*Id.* at 15-22.)  Finally, Plaintiff submits that the vocational testimony is in conflict with the RFC and the DOT.  (*Id.* at 22-25.)  The Court addresses each argument, in turn.

A.   **Obesity**

Plaintiff argues that despite having found Plaintiff's obesity to be a severe impairment at step two, the ALJ did not properly consider Plaintiff's obesity at subsequent steps of his analysis. (Pl. Br. at 10.)  In particular, Plaintiff claims that the ALJ did not provide any meaningful analysis or discussion of Plaintiff's obesity at step three.  *(Id.* at 11.)

At step three, the ALJ determines whether any of a claimant's impairments, alone or in combination with other impairments, meet or are medically equivalent to one of the impairments in the Impairment List.  In 2000, the Commissioner removed obesity from the Impairments List, but "this [change] did not eliminate obesity as a cause of disability."  *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 503 (3d Cir. 2009). Rather, the Commissioner has since promulgated a series of SSRs, which indicate how obesity is to be considered under the listings.  *Id.*  For instance, in 2002, the Commissioner promulgated SSR 02-1p, which superseded SSR 003-p, and instructed adjudicators to "consider the effects of obesity not only under the listings but also when assessing

a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity."   SSR 02–1P, 2000 WL 628049, at *1.   Although SSR 02-1p superseded SSR 003-p, it did not materially amend SSR 003-p.   *See Diaz*, 577 F.3d at 503.

In *Diaz*, the Third Circuit explained that pursuant to SSR 003-p, "an ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step." *Id*. at 504. Meaningful review is more than a "bare conclusion" or "conclusory statement," *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000), but does not require the use of particular language or a particular format. *Jones*, 364 F.3d at 505.   It simply requires sufficient development of the record and explanation of the ALJ's findings.   *Id*.

Here, I acknowledge that the ALJ's analysis of Plaintiff's obesity at step three is scarce. The ALJ noted that Plaintiff's obesity "cannot meet a listing" because it is not a listed impairment but stated that he had "considered analogous and related listings."   (A.R. 18.)   However, the ALJ provided no explanation as to why Plaintiff's obesity did not meet analogous listings or analysis of the effect of Plaintiff's obesity in combination with her other impairments.   The ALJ's comment that he had "considered analogous and related issues," alone, is precisely the type of conclusory statement that is insufficient to constitute meaningful review under *Burnett*.

The Commissioner argues that *Diaz*'s requirement of meaningful review at step three is inapplicable here, because it discussed an outdated regulation, SSR 003-p.   Specifically, the Commissioner emphasizes that while SSR 02-01p did not change SSR 003-p, current regulation, SSR 19-2p rescinded and replaced SSR 02-01p.   (Defendant's Brief, ("Def. Br.") at 16.)   SSR 19-2p provides, in pertinent part:

> Obesity is not a listed impairment; however, the functional limitations caused by the MDI of obesity, alone or in combination

> with another impairment(s), may medically equal a listing. For example, obesity may increase the severity of a coexisting or related impairment(s) to the extent that the combination of impairments medically equals a listing.
>
> We will not make general assumptions about the severity or functional effects of obesity combined with another impairment(s). Obesity in combination with another impairment(s) may or may not increase the severity or functional limitations of the other impairment. We evaluate each case based on the information in the case record.

Although the parties do not dispute that SSR 19-2p rescinded and replaced its predecessor SSR 02-01p, the Commissioner fails to cite a single authority that challenges the applicability of *Diaz's* meaningful review instruction. Notably, several courts in this district have continued to apply such guidance in the context of SSR 19-2p. *See, e.g.*, *Andres F. v. Comm'r of Soc. Sec.*, No. 19-19527, 2022 WL 769972, at *6 (D.N.J. Mar. 14, 2022); *William J.-P. v. Kijakazi*, No. 20-18081, 2022 WL 909665, at *7 (D.N.J. Mar. 29, 2022).

Contrary to Plaintiff's position, however, the facts in *Diaz* are distinguishable from the instant case. There, the ALJ identified the claimant's obesity as a severe impairment but offered no explanation of its cumulative impact on the claimant's ability to function. *Diaz*, 577 F.3d at 504. Indeed, the Third Circuit cautioned that while such an omission was error, "were there *any* discussion" of the combined effect of Plaintiff's obesity with his other impairments, the outcome may have been different. *Id*.

Here, notwithstanding the ALJ's scant analysis of Plaintiff's obesity at step three, the ALJ's opinion, read in its entirety, permits meaningful review of Plaintiff's obesity. Specifically, at step four, the ALJ stated the following:

> [A]t points throughout the record, the claimant was obese with a body mass index in excess of 30 . . . . While the claimant was obese, which can exacerbate fatigue and other symptoms related to obesity, there does not appear to be a significant impact on her

20

> cardiovascular systems . . . . Her gait was normal . . . . Pursuant to
> SSR 19-2, the undersigned finds that plaintiff's obesity in
> combination with her other impairments cause significant
> limitations in her ability to perform basic work activities, but the
> residual functional capacity above, which limits the claimant to light
> exertional work adequately accounts for this.

(A.R. 20.)  Although the ALJ acknowledged that Plaintiff's obesity does not appear to significantly impact her cardiovascular systems on the one hand, he also recognized that her obesity in combination with her other impairments limits her ability to perform basic work activities, and accordingly endorsed a light exertion limitation to account for such a combination.

Nonetheless, even assuming that Plaintiff is correct that the ALJ's analysis was deficient at steps three and four, Plaintiff fails to demonstrate how further consideration of her obesity would have changed the ALJ's ultimate determination that she was not entitled to benefits.  Indeed, as the party challenging the agency's determination, it is Plaintiff's burden to show harmful error.  *See Shineski v. Sanders*, 556 U.S. 396, 409 (1969) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *see also Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) ("[A] remand is not required here because it would not affect the outcome of the case.").  Here, Plaintiff fails to cite any record evidence to support her position, let alone any evidence that requires a different determination at steps three and four.  Indeed, when applying for benefits, Plaintiff did not even allege disability based on obesity, and further, the record also shows that on several occasions on examination, Plaintiff was described as appearing "healthy and well developed." (*See, e.g.*, A.R. 510-11.)  As such, the Court does not find remand for further discussion of Plaintiff's obesity to be necessary.

### B.  Plaintiff's Exertional and Non-Exertional RFC

Plaintiff next argues that the RFC is not supported by substantial evidence.  Specifically, Plaintiff argues that the ALJ failed to engage in evidentiary analysis sufficient to support his

endorsement of a light exertion limitation.  (Pl. Br. at 21.)  In addition, Plaintiff contends that the ALJ offered no support for his assessment that notwithstanding Plaintiff's severe mental impairments, she could work so long as she had only occasional interaction with supervisors and coworkers, and was limited to simple repetitive tasks.  (*Id*. at 22.)

"Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  *Burnett*, 220 F.3d at 121 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see* 20 C.F.R. § 404.1545(a).  The ALJ is responsible for determining an individual's RFC.  2 0 C.F.R. § 404.1546; *see Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.").  In determining a claimant's RFC, "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." *Plummer*, 186 F.3d at 429. "Where the ALJ's findings of fact are supported by substantial evidence, [courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently." *Hagan v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012) (internal quotation marks and citation omitted).  "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

Here, the ALJ determined that Plaintiff could perform light work as follows:

> There should be no exposure to unprotected heights or hazardous machinery.  There should be no direct contact with the general public.  The claimant cannot work in tandem with coworkers, such as on an assembly line.  She can only perform work where production is measured at the end of the day and not throughout the course of the day.  The claimant is able to understand, remember, and carry out simple instructions with only occasional changes to essential job functions.  She is able to make simple work related decisions.

(A.R. 20.)  In support of Plaintiff's exertional RFC, the ALJ cited various evidence on examination from Plaintiff's doctor's appointments.  For instance, as to Plaintiff's musculoskeletal system, the ALJ pointed to several records that showed Plaintiff had a normal gait; normal (5/5) motor strength; normal muscle tone and bulk; and intact sensation.  (A.R. 21.)  The ALJ also noted that while Plaintiff often had normal deep tendon reflexes during physical examinations, at times she had slightly diminished reflexes.  (*Id*.).

Next, the ALJ recognized that Plaintiff has psychogenic seizures with frontal lobe syndrome and migraines.  (*Id*.)  However, the ALJ explained that records showed improvement in the frequency of her seizures with medication and sleep quality.  (*Id*.)  For example, the ALJ cited a record from January 2015 that indicated that in June 2014, Plaintiff had first developed seizures prior to the December 2014 alleged onset date.  But, Plaintiff's seizures then improved with prescription drug Topiramate.  (A.R. 489-90.)  Although Plaintiff self-reported an uptick in seizure frequency in July 2015, relative to later months in 2015, (A.R. 294), she had allegedly ceased taking her seizure medication around that time upon discovering that she was pregnant.  (A.R. 57.)  In fact, in August 2015, an Emergency Room physician opined that Plaintiff's seizures were "likely due to medication noncompliance."  (A.R. 715.)  Moreover, based on Plaintiff's own testimony, her doctors continued to adjust her seizure medication throughout her pregnancy, which effectively controlled her symptoms.  (A.R. 57.)  Indeed, the record that shows a higher frequency in seizures during the approximate timeframe Plaintiff was non-compliant with her medications, and the reduction in the frequency of seizures while on medication, is consistent with the ALJ's observation that Plaintiff's seizures improved with medication.  Further, the ALJ noted that Plaintiff's cranial nerves were intact, and magnetic resonance imaging of Plaintiff's brain revealed no evidence of intracranial mass, mass effect, extra-axial collection in the cerebral hemispheres,

hemorrhage, focal diffusion abnormalities, or abnormal brain stem functions.  (A.R. 21-22.)  The ALJ also stated that Plaintiff was noted to have minimal postictal confusion following her seizure episodes.  (A.R. 22.)  As a result of these findings, the ALJ further limited Plaintiff to no exposure to unprotected heights or hazardous machinery.  (A.R. 23.)  I cannot find that the ALJ erred in this context.

Plaintiff further argues that the ALJ erred by failing to articulate a function-by-function analysis, including discussion of the duration that Plaintiff can sit, the length that she can stand/walk, and the weight that she can lift/carry, before finding a light exertion RFC.  (A.R. 21.).  However, an ALJ opinion need "not explicitly lay out function-by-function analysis or specify the amount of time the [p]laintiff could stand, walk, and sit, and the amount of weight she could regularly lift and carry [where] the record makes clear the ALJ performed a function-by-function analysis and considered any functional limitations."  *Chapman v. Comm'r of Soc. Sec.*, No. 17-5561, 2018 WL 6499870, at *7 (D.N.J. Dec. 11, 2018); *Maria D. v. Comm'r of Soc. Sec.*, No. 20-11585, 2022 WL 855652, at *10 (D.N.J. Mar. 23, 2022) ("The Third Circuit has never required that an ALJ perform a 'function-by-function' analysis at step four, so long as the ALJ's RFC determination is clear and supported by substantial evidence in the record.") (citing *Glass v. Comm'r of Soc. Sec.*, No. 18-15279, 2019 WL 5617508, at *8 (D.N.J. Oct. 31, 2019)); *see also Garret v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 164 (3d Cir. 2008).

Here, the record makes clear that the ALJ performed a function-by-function analysis and considered Plaintiff's functional limitations.  At the hearing, the ALJ questioned Plaintiff on her functional capacities and on the work she performed at her previous teaching jobs.  (A.R. 50-76.)  Thereafter, the ALJ considered Plaintiff's testimony regarding the frequency and length of her seizure episodes, panic attacks, and migraines, as well as her use of a cane after an injury to her

24

leg from a car accident in 2009.  (A.R. 20.)  Further, although the ALJ did not explicitly state how long Plaintiff could stand, walk, and sit or the amount of weight she could lift, the ALJ did determine that Plaintiff could perform "[l]ight work as defined in 20 CFR 404.1567(b)," (A.R. 22), which defines light work as generally involving lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and "a good deal of walking or standing."  20 CFR 404.1567(b).

Next, as to the ALJ's non-exertional RFC, Plaintiff contends that despite acknowledging her bi-polar disorder, PTSD, attempted suicides, and inpatient psychiatric hospitalizations, as well as moderate limitations in all four broad areas of mental functioning, the ALJ does not explain his conclusion that Plaintiff can sustain simple unskilled work and occasional interaction with supervisors and coworkers.  The Court disagrees.

Here, the ALJ began by explaining that he is "cognizant of the substantial overlap in symptomology between different mental impairments, as well as the inherently subjective nature of mental diagnoses, . . . [and] [a]ccordingly . . . has considered [Plaintiff's] psychological systems and their effect on functioning together, instead of separately, regardless of the diagnostic label attached."  (A.R. 22.).  Indeed, despite finding Plaintiff's bipolar disorder, anxiety, and PTSD severe at step two, and moderate limitations in all broad areas of functioning, at step three, the ALJ determined that Plaintiff retained the RFC to perform simple work.  Contrary to Plaintiff's position that the ALJ offered no explanation for his finding of a simple work limitation, the ALJ cited record evidence from examinations of Plaintiff's normal/intact memory, fund of knowledge within normal limits, and superior intellectual functioning in support of his determination that Plaintiff retained the capability to understand, remember, and carry out simple instructions and make simple work-related decisions.  (A.R. 23.)  In addition, the ALJ cited descriptions of Plaintiff in the record

25

as "cooperative," and "pleasant" in finding that Plaintiff can tolerate occasional interaction with co-workers and supervisors. (*Id*.). However, the ALJ stated that "[t]here should be no direct contact with the general public" and Plaintiff "cannot work in tandem with workers, such as on an assembly line." (*Id*.) In support of a further limitation to only performing work where production is measured at the end of the day, the ALJ cited record evidence of Plaintiff being alert and fully oriented, and displaying intact/normal attention and concentration, as well as logical thoughts on examination. (*Id*.). Further, the ALJ found that record evidence of normal (intact) to fair judgment and insight, lack of suicidal or homicidal ideation, and lack of behavior abnormalities supported a limitation to "only occasional changes to essential job functions." (*Id*.). Thus, the Court finds that the ALJ has offered sufficient explanation in support of his conclusion that despite her impairments, Plaintiff retains the capability to perform simple work and occasionally interact with co-workers and supervisors.[3]

## C.  Conflict between the VE Testimony and the RFC

Next, Plaintiff argues that there was an apparent conflict between the vocational testimony, the RFC adopted by the ALJ, and the DOT. (Pl. Br. at 22-25.) Specifically, Plaintiff contends that the positions indicated by the VE at step five do not fit the RFC based on the DOT. (A.R. 24.) As

---

[3]     In a footnote, the Plaintiff argues that there is "no meaningful reference to mental health records (Tr. 1630-1743)" dated June 15, 2017 through March 14, 2018 or "psychiatric hospitalizations (Tr. 1842-1938)" dated June 21, 2016 through December 21, 2017 or "even a discussion as to why [P]laintiff required psychiatric hospitalizations." (Pl. Br. at 22, n.6.) Plaintiff's argument that there is no meaningful discussion of Plaintiff's mental health records is belied by the ALJ's extensive citations to psychiatric progress notes from Genpsych PC. (A.R. 22, citing Ex. 3F, A.R. 776-841.) And, although it appears that the ALJ did not discuss Plaintiff's hospitalizations in his RFC analysis, he did consider Plaintiff's testimony that she "has required in-patient psychiatric care." (A.R. 20.) What is more, to the extent Plaintiff exclusively relies on the above cited records, such reliance is misplaced as those records fall outside of the relevant time period, and thus need not be considered by the ALJ. *See Ortega v. Comm'r of Soc. Servs.*, 232 F. App'x 194, 197 (3d Cir. 2007).

stated above, the VE testified that Plaintiff could perform the positions of Housekeeper, DOT # 323.687-014, Price Marker, DOT # 209.587-034, and Routing Clerk, DOT # 222.687-022.

First, Plaintiff argues that the DOT descriptions for the jobs of Housekeeper and Price Marker do not comply with the RFC's limitation of no direct interaction with the general public. (A.R. 23.)  For instance, Plaintiff contends that the housekeeper position necessarily involves contact with the general public as the DOT describes a housekeeper as a person who "cleans rooms and halls in commercial establishments such as hotels, restaurants, clubs, beauty parlors, and dormitories."  DOT 323.687-014, 1991 WL 672783.  Further, Plaintiff contends that the price marker position must involve direct contact with the public as "we've all seen this job being done because we are part of the general public."  (Pl. Br. at 23.)

However, Plaintiff's argument neglects the fact that the DOT descriptions for Housekeeper and Price Marker have a "People" level of 8, the lowest rating in the "People" category numbered 0-8, for the type of social interaction each occupation requires.  *Tracey v. Comm'r Soc. Sec.*, 760 F. App'x 121, 124 (3d Cir. 2019).  A job with a social interaction level of "8" means that "the degree of relation to people required for that position is [n]ot [s]ignificant." *Scott C. v. Comm'r of Soc. Sec.*, No. 20-109, 2021 WL 2682276, at *5 (D. Vt. June 30, 2021).  Courts have determined that level 8 interaction is compatible with an RFC limitation of only superficial contact with the public.  *See Sweeney v. Colvin*, No. 13-2233. 2014 WL 4294507, at *17 (M.D. Pa. Aug. 28, 2014) (listing cases); *Keens v. Kijakazi*, No. 20-2135, 2022 WL 635540, at *10-11 (M.D. Pa. Feb. 8, 2022), *report and recommendation adopted*, No. 4:20-02135, 2022 WL 626771 (M.D. Pa. Mar. 3, 2022) (finding ALJ's failure to include limitations to account for the claimant's inability to interact with the public harmless error because the ALJ identified a significant number of jobs, including the job of Housekeeper, where the plaintiff would be expected to have basic interaction with others

27

on a "not significant" basis).  Thus, the Court finds that the Housekeeper and Price Marker positions, with their low "People" category of 8, are compatible with an RFC limitation of no direct contact with the public.  Accordingly, no conflict exists between the VE's testimony that the Plaintiff could perform the positions of Housekeeper and Price Marker and the no direct contact with the public limitation in the RFC adopted by the ALJ.

Next, Plaintiff argues that the job description for the job of Routing Clerk, DOT # 222.687, includes both assembly-line work and work around dangerous machinery as it involves a conveyor belt, and thus contradicts the RFC's limitations that Plaintiff not "work in tandem with coworkers, such as on an assembly line," or be exposed to "hazardous machinery."  (A.R. 20.)  Although Plaintiff has not cited any authority in support of her claim that conveyor belt work necessarily involves hazardous machinery, I agree that conveyor belt work conflicts with Plaintiff's restriction from tandem work on an assembly line.  *See Kelly P. v. Saul*, No. 18-00777, 2019 WL 3573591, at *4 (C.D. Cal. Aug. 6, 2019) (finding an apparent and obvious conflict between the Routing Clerk job and a restriction from working on an assembly line); *Laura K. v. Kijakazi*, No. 20-2215, 2021 WL 4391123, at *6 (D. Md. Sept. 24, 2021) ("Th[e] task of looking at items on a conveyor belt and removing specific items conflicts with an RFC precluding fast paced, assembly line work.") (internal quotations and citation omitted).  The Commissioner cites *Shader v. Colvin*, 14-29, 2015 WL 476311, at *8 (E.D. Ky. Feb. 5, 2015), in support of its position that there is no conflict between the DOT and Plaintiff's RFC.  However, the Court is not persuaded by the ALJ's statement in *Shader* that "work on a conveyor belt or table is *not exclusively* fast-paced or assembly work."  *Id*. (emphasis added).  Nonetheless, because the ALJ provided at least two jobs in the national economy existing in significant numbers that Plaintiff can perform, I find no cause for remand on this ground.  *See Danilowicz v. Kijakazi*, No. 20-01605, 2022 WL 19624, at *7 (M.D.

Pa. Jan. 3, 2022) (ALJ satisfied his step five determination by identifying at least one job that claimant could perform); *see also* 20 C.F.R. § 416.966(b) ("if work that you can do does exist in the national economy, we will determine that you are not disabled").

IV.   **CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ's decision was supported by substantial evidence in the record. Accordingly, the ALJ's decision is **AFFIRMED**. An appropriate Order shall follow.


Dated: October 27, 2022                              /s/ Freda L. Wolfson
                                                     Hon. Freda L. Wolfson
                                                     U.S. Chief District Judge